# In the United States Court of Federal Claims

No.  12-245C

(Filed:  March 28, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| ) | Contract dispute; property acquisition and |
| **ROLLOCK COMPANY, et at.,** ) | relocation contract entered to support |
| ) | creation of the Flight 93 National |
| **Plaintiffs,** ) | Memorial; claims under the Contract |
| ) | Disputes Act, 41 U.S.C. § 7104, and the |
| **v.** ) | Uniform Relocation Assistance and Real |
| ) | Property Acquisition Policies Act, 42 |
| **UNITED STATES,** ) | U.S.C. § 4622; jurisdiction; exhaustion of |
| ) | administrative remedies; inchoate claims |
| **Defendant.** ) | and contracting officer's incipient |
| ) | decisions; remand |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Irving M. Portnoy, Portnoy & Quinn, LLC, Pittsburgh, Pennsylvania, for plaintiff.

Sarah M. Valenti, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Stuart F. Delery, Assistant Attorney General, Bryant G. Snee, Acting Director, and Steven J. Gillingham, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was James Epstein, Office of the Northeast Regional Solicitor, United States Department of the Interior.

## OPINION AND ORDER

LETTOW, Judge.

The dispute in this case is over terms of a property acquisition and relocation contract between the government and the plaintiffs, the Rollock Company, Anthony Kordell, and Christopher Kordell (collectively "the Rollock plaintiffs" or "Rollock").  The National Park Service ("NPS") purchased land owned by the Rollock plaintiffs for the Flight 93 National Memorial, land on which Rollock operated a scrap metal recycling facility.  Compl. ¶¶ 2, 9. [1]  In contemplation of the land purchase, the contract between the parties provided for: (1) the sale of business scrap inventory from Rollock to NPS and (2) a self-move of Rollock's business personal property, including embedded materials, to a new location.  NPS agreed to pay Rollock for monitoring costs associated with disposition of the scrap inventory NPS was purchasing and

---

[1]Messrs. Kordell were the owners of the land, which had been leased to the Rollock Company, and they were also officers and employees of the company.  Compl. ¶¶ 7, 8.

removal of Rollock's business personal property from the land.  Rollock alleges that NPS violated the terms of the contract by refusing to pay the full amount owed for the costs of monitoring and of removal of Rollock's business personal property.  Compl. ¶¶ 28-29.  Pending before the court is the government's Motion to Dismiss for Lack of Jurisdiction or, in the Alternative, for Summary Judgment ("Def's Mot."), ECF No. 15.  This motion has been fully briefed, and a hearing was held on January 7, 2014.

## BACKGROUND[2]

In 2008, NPS approached the Rollock plaintiffs to discuss purchasing the property on which Rollock's scrap business was located, for the purpose of reconfiguring the property as part of a memorial for the victims of Flight 93, which crashed as a result of terrorist acts on September 11, 2001.  *See* Pl.'s Br. in Opp'n to Def.'s Mot. ("Pl.'s Opp'n") at 5, ECF No. 18; *see also* Def.'s Mot. at 2.  Between July 28, 2008 and July 17, 2009, NPS and Rollock negotiated an agreement for the acquisition of the land and another agreement for the purchase of certain materials and the relocation of Rollock's business.  *See* Def.'s App. A1-A50.[3]  During this discussion, NPS informed Rollock that relocation expenses would be covered by the government in accordance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("Relocation Act"), Pub. L. 91-646, 89 Stat. 1894 (1971) (codified, as amended, at 42 U.S.C. § 4601-55), and its accompanying regulations found at 49 C.F.R. Part 24.  *See* Def.'s App. A12 (Letter from Linda Beyer, NPS realty and relocation specialist, to Anthony and Christopher Kordell and William Moot, Counsel (Jan. 26, 2009)).  During the negotiations, Rollock notified NPS that it considered materials embedded in the ground to be personal property of substantial value and that it wished to reclaim this material as was customary for scrap metal operators.  Def.'s App. A15-16 (Letter from Moot to Beyer (Feb. 18, 2009)).[4]  NPS agreed that embedded materials should be considered personal property and included in the relocation process, Def.'s App. A24 (Letter from Robert Merryman, O.R. Colan Assocs., to Moot (Mar. 26, 2009)), and further advised Rollock that it had the "right to have professional services performed to assist with [the] move" but that "[a]ny professional services needed will require advanced approval from [NPS] before fees can be authorized."  Def.'s App. A21 (Letter from Beyer to Moot (Mar. 31, 2009)).

As a result of these negotiations, NPS prepared and transmitted a "Draft Proposed Relocation Agreement" on July 17, 2009.  Def.'s App. A34.  This agreement was executed by Rollock on August 25, 2009 and by NPS on August 27, 2009.  Def.'s App. A58-78 ("Relocation

---

[2]The recitation of circumstances which follows does not constitute findings of fact by the court and is given solely to provide a context for deciding the pending motion.  Disputes of fact are noted.

[3]For convenience, the court will cite the extensive appendix to the government's Motion to Dismiss using the designation "Def.'s App. __" and referring to pages within the sequential pagination of documents contained in the appendix.

[4]This material included both magnetic and non-magnetic material of financial value to Rollock.  Def.'s App. A15.

Agreement" or "Agreement").  NPS agreed to purchase Rollock Company's stockpiled business scrap inventory for $1,812,000.00, a scale for $65,000.00, and stockpiled topsoil for $290,192.00.  Def.'s App. A58-59.  NPS also agreed to provide self-move relocation costs for Rollock's embedded material inventory based on 49 C.F.R. 24.301(d)(2)(i).[5]  Def.'s App. A59.[6]  The parties agreed that NPS would excavate the embedded material and place it in stockpiles at the Rollock site.  *Id.*  Rollock would then remove the stockpiles and transport them to a new location within 50 miles of the Rollock site.  *Id.*  The timeline provided in the Agreement stated that NPS would excavate the embedded material within sixty days from the disposition of the business scrap inventory NPS was purchasing and that Rollock would remove the resulting stockpiles within thirty days after NPS notified it that the stockpiles were completed.  *Id.*

Because the transfer of the business scrap and the removal of the embedded material was to take place over a period of months, Rollock would require personnel to monitor the site.  In the "business scrap inventory" section of the Agreement, the contract provided reimbursement for these monitoring costs, stating that

Rollock will be reimbursed for related costs paid to any persons to monitor the progress of the sale by NPS, or their contractor, of the [business scrap inventory] and the removal of the [embedded material].  The cost of said reimbursement will be at a pre-determined rate agreed to by NPS and Rollock[,] which rate will be the actual documented rate paid for such monitoring personnel.

Def.'s App. A59.  NPS and Rollock later confirmed that the rate for the monitor at the Rollock site would be $60.00 per hour.  *See* Def.'s App. A86 (Letter from Moot to Beyer (Oct. 19, 2009)); Def.'s Mot. at 7; Pl.'s Opp'n at 8.

## A.  Monitoring Costs

NPS acquired title to the Rollock site on September 23, 2009.  Pl.'s Opp'n at 7.  Thereafter, Rollock began submitting claims to NPS for reimbursement of monitoring costs.  The first claim submitted totaled $15,840.00 and covered the period from October 14, 2009 to November 24, 2009.  Def.'s App. A87.  This claim was calculated at the rate of $60.00 per hour with overtime at $90.00 per hour.  *Id.*  With its claim, Rollock submitted an affidavit by Anthony Kordell certifying the hours worked by the monitor.  Def.'s App. A87.  On December 10, 2009, NPS, without requiring additional documentation from Rollock, approved the claim.  *See* Def.'s App. A92.  Rollock continued to submit claims for monitoring in the same manner, *i.e.*, with an

---

[5]The regulation provides that payment for a self-move by a business may be based on "[t]he lower of two bids or estimates prepared by a commercial mover or qualified [a]gency staff person.  At the [a]gency's discretion, payment for a low cost or uncomplicated move may be based on a single bid or estimate."  49 C.F.R 24.301(d)(2)(i).

[6]Under the terms of the Agreement, embedded material covered "subterranean scrap material found under the [business scrap inventory] piles . . . and is defined as the scrap material located within [one] foot of the surface under each [business scrap inventory] pile."  Def.'s App. A59.

affidavit certifying hours worked by the monitor and at the hourly rate of $60.00 with overtime calculated at $90.00 per hour.  Pl.'s Opp'n at 8; *see also* Def.'s Mot. at 8.  Between March 29, 2010 and May 5, 2010, Rollock submitted three additional claims for monitoring that took place between November 25, 2009 and April 27, 2010.  Pl.'s Opp'n at 8; Def.'s Mot. at 8.[7]  On March 31, 2010, Rollock submitted to NPS a letter outlining concerns it had regarding progress on removal and payment for the business scrap inventory, recovery of the embedded material, and payment for the outstanding claims for monitoring costs.  Def.'s App. A112-117 (Letter from Moot to Anthony Conte, NPS Regional Solicitor (Mar. 31, 2010)).

On June 18, 2010, NPS notified the Rollock plaintiffs that "to process payment for the monitor[,] the NPS must have receipted evidence of payment to the employee and timesheets." Def.'s App. A120 (Letter from Conte to Moot (June 18, 2010)).  In response, on June 25, 2010, Rollock submitted canceled checks issued to the monitor dating from October 30, 2009 to May 28, 2010.  Def.'s App. A121, A134-49.  Rollock also submitted an additional claim of $12,660.00 for monitoring between April 28, 2010 to May 25, 2010, bringing the total unpaid claim amount to $69,465.00.  Def.'s App. A127.[8]  The documents that Rollock submitted showed that the monitor was being paid an hourly rate of $40.00 with overtime calculated at $60.00 per hour.  Def.'s App. A157.  On July 9, 2010, NPS responded to the Rollock plaintiffs to advise them that it considered the total reimbursable costs for the monitor to be the actual expense paid by Rollock to the monitor, calculated at $40.00 of regular pay per hour, rather than the earlier agreed rate of $60.00 per hour.  Def.'s App. A159 (Letter from Beyer to Moot (July 9, 2010)).  NPS determined that it owed Rollock a total of $29,108.39, the difference between the total monitoring expense of $44,948.39 actually paid to the monitor less $15,840.00 already paid by NPS to Rollock.  *Id.*  Rollock responded on July 14, 2010, stating that it believed the contract indicated that the proper reimbursement amount should be calculated based on $60.00 per hour and that the actual wages of $40.00 per hour did not adequately cover the costs to the company for employing the monitor.  Def.'s App. A161 (Letter from Moot to Beyer (July 14, 2010)).[9] NPS disagreed; on July 14, 2010, it paid Rollock $29,108.39, reflecting the total it believed was due to Rollock.  Def.'s App. A165.[10]

---

[7]The first claim sought $26,565.00 for November 25, 2009 through February 2, 2010, the second claim requested $18,180.00 for the period of February 3, 2010 to March 16, 2010, and the third claim sought $12,060.00 for March 17, 2010 to April 27, 2010.  Def.'s App. at A104, A110, A119.

[8]This additional claim was also calculated at an hourly rate of $60.00 with overtime at $90.00 per hour.  Def.'s App. A127.

[9]Although a spreadsheet appears on Def.'s App. A157 summarizing Rollock's indirect employee costs, encompassing payments for such things as social security and Medicare taxes, unemployment insurance, accident insurance premiums, and health care premiums, NPS appears to have failed to consider the relevance of these indirect costs.

[10]NPS informed Rollock that claims for reimbursement required documentation of payments and audit sheets, Def.'s App. A165, which Rollock provided on August 9, 2010, Def.'s App. A170.

On September 7, 2010, NPS informed Rollock that it was "not obligated to pay . . . monitoring costs beyond June 24, 2010" because, according to NPS, stockpiling of embedded material ended on June 24, 2010, despite the fact that an additional 1.8 acres still needed to be scraped.  Def.'s App. A211 (Letter from Conte to Moot (Sept. 7, 2010)) ("While we realize now that approximately 1.8 acres has not been completed, for all intents and purposes, a monitor will not be necessary until the new permits arrive and NPS schedules the scraping of the remainder of the embedded material.").  On September 22, 2010, NPS determined it owed Rollock an additional $16,722.00 for monitoring costs, reflecting a total reimbursable amount of $61,670.00 for monitoring through May 25, 2010.  Def.'s App. A215 (Letter from Beyer to Moot (Sept. 22, 2010)).  NPS also stated that Rollock could submit additional reimbursement claims for monitoring costs occurring between May 26, 2010 and June 24, 2010, acknowledging also that Rollock could incur additional monitoring costs for the scraping of the remaining 1.8 acres.  *Id.*  On November 23, 2010, NPS clarified its position on monitoring reimbursement, indicating that due to delays in securing necessary permits, no monitoring was necessary from June 24, 2010 until scraping of the remaining 1.8 acres began.  Def.'s App. A230 (Letter from Beyer to Moot (Nov. 23, 2010)); *see also* Def.'s App. A229 (e-mail from Beyer (Nov. 3, 2010)).

Rollock responded to NPS, disagreeing with NPS's conclusion that monitoring was not needed after June 24, 2010.  Def.'s App. A231 (Letter from Moot to Beyer (Dec. 2, 2010)).  Rollock interpreted the Agreement to require monitoring until all the embedded material was removed, and because this condition had not been met, Rollock believed that NPS was still obligated to pay monitoring costs.  *Id.*  Accordingly, Rollock submitted a claim totaling $76,305.00 for monitoring costs between May 26, 2010 through November 23, 2010 at the hourly rate of $60.00 with overtime at $90.00 per hour.  *See id.*[11]  NPS responded on December 20, 2010, that it had determined $8,110.00 was reimbursable for monitoring between May 26, 2010 and June 22, 2010 and denied the remaining amounts claimed.  Def.'s App. A245 (Letter from Beyer to Moot (Dec. 20, 2010)).  NPS reiterated that monitoring was not required until permits were obtained and then "[a]ctual monitoring expenses for [removal activity] can be submitted for reimbursement."  *Id.*  NPS advised that Rollock had the right to appeal the denial of this most recent claim for reimbursement via written appeal within 60 days to the Department of the Interior, Office of the Director, Office of Hearing and Appeals.  *Id.*  NPS did not include any statutory or regulatory citations that might identify and clarify the appeals process.  *See* Pl.'s Opp'n at 11; *see also* Def.'s App. A245.  Rollock did not file an appeal with the Office of Hearing and Appeals.  Def.'s Mot. at 10.  Instead, Rollock responded with a letter reiterating its arguments for reimbursement for the *total* monitoring costs claimed and indicating that it believed the Contract Disputes Act, 41 U.S.C. §§ 7101-09, should govern the dispute.  Def.'s

---

NPS sent a proposed amendment to the Agreement on July 28, 2010.  Def.'s App. A166.  The proposed amendment would have set reimbursement for monitoring costs at $60.00 per hour, required Rollock to provide NPS with cancelled checks and payroll pay stubs, and provided an end date to monitoring on July 30, 2010.  Def.'s App. A167.  The amendment was never executed.  *See* Pl.'s Opp'n at 10 n.3.

[11]Rollock asserted that the amount paid by NPS for monitoring through May 25, 2010 was insufficient and "d[id] not accept the prior payments as 'payment in full.'"  Def.'s App. A231.

App. A247 (Letter from Moot to Beyer (Feb. 18, 2011)).  NPS replied with "a final response," repeating its arguments that monitoring was not necessary after June 24, 2010.  Def.'s App. A248 (Letter from Beyer to Moot (Mar. 15, 2011)).  After NPS's "final response," Rollock continued to monitor the movement of embedded material and to submit claims for both monitoring and relocation costs, and NPS paid portions of these further claims.  Def.'s App. A249-373.  Movement of material and monitoring may have ceased in October 2011.  Def.'s App. A362 (Letter from William Sindelar, NPS Land Acquisition Officer, to Moot (Oct. 6, 2011)).  To date, Rollock has submitted claims for monitoring costs totaling $286,321.00; of this amount, $69,780.39[12] appears to have been paid by NPS.  Pl.'s Opp'n at 12.

## B.  Embedded Materials

On May 17, 2011, NPS notified Rollock that the embedded material inventory had been stockpiled and was ready to be removed from the site.  Def.'s App. A249 (Letter from Sindelar to Moot (May 17, 2011)).  NPS also included information regarding a bid it had received for the loading and hauling of the embedded material, totaling $635,000.00 for an approximate volume of 19,037 cubic yards of stockpiled embedded material.  Def.'s App. A249-54.  Using this bid as its reference, NPS determined that the "total reimbursable payment due upon completion of this self-move of the [s]tockpiled [e]mbedded [m]aterial will be $635,000.00."  *Id.*  Rollock responded on May 19, 2011, requesting an advance relocation payment, similar to advance payments made by NPS for earlier self-moves of Rollock's personal property.  Def.'s App. A259 (Letter from Moot to Sindelar (May 19, 2011)).  NPS denied Rollock's request for an advance because the program was "a reimbursable program" that did not allow payment for costs not yet incurred.  Def.'s App. A274 (Letter from Sindelar to Moot (June 22, 2011)).  NPS did confirm that it "would consider partial payments paid directly to a contractor provided [it] had a valid contract to move the [s]tockpiled [e]mbedded [m]aterial."  *Id.*[13]

On June 20, 2011, Rollock sold to Kinsley Construction, Inc. ("Kinsley") approximately 4,500 cubic yards of topsoil[14] which was stockpiled at the Rollock site, for a total price of one dollar.  Def.'s App. A294 (Letter from Greg Martz, Kinsley Construction Project Manager, to

---

[12]Rollock states that NPS provided reimbursement totaling $44,949.39 for the monitoring costs, but the documentary materials provided indicate that $69,780.39 was actually paid.  *See* Def.'s App. A92 ($15,840.00 payment voucher signed Dec. 10, 2009), A154 ($29,108.39 payment approved on July 12, 2010). A219 ($16,722.00 payment voucher signed Oct. 4, 2010), A245 ($8,110.00 payment voucher signed Dec. 20, 2010).

[13]NPS had previously indicated that 49 C.F.R. § 24.207(c) would permit an advanced relocation payment if Rollock could demonstrate a need for one and submit a self-move claim for the relocation.  *See* Def.'s App. A260 (letter from Sindelar to Moot (May 25, 2011)).  Rollock submitted the relevant documentation, Def.'s App. A262, but NPS did not approve the advance. Def.'s App. A274.

[14]The government characterizes this topsoil as "non-co[n]taminated dirt from the [s]tockpiled [e]mbedded [m]aterial pile."  Def.'s App. A288.

Moot (June 20, 2011)); Hr'g Tr. 26:5 to 27:20, 28:7-11 (Jan. 7, 2014).[15]  The "topsoil" was dirt that had been accumulated during the process of scraping and removing the embedded material. Hr'g Tr. 26:5 to 27:20.  Kinsley paid Rollock and removed the topsoil from the site before the end of June.  *See* Def.'s App. A288 (e-mail from Sindelar (June 20, 2011)).[16]  Kinsley reportedly was the government's contractor to prepare the Flight 93 site for the memorial, and it apparently wanted the dirt as fill in leveling the ground.  Hr'g Tr. 27:1-7.

On June 27, 2011, Rollock hired Military Resource Enhancement Specialists, Inc. ("MRES") to move the stockpiled embedded material.  The contract specified relocation of an estimated 19,037 cubic yards of material for $635,000.00.  Def.'s App. A280 (Agreement between Rollock and MRES (June 27, 2011)).  Rollock informed NPS of the contract with MRES, Def.'s App. A276 (Letter from Moot to Sindelar (June 28, 2011)), but not of the contract with Kinsley, *see* Def.'s App. A276, A288.  Rollock also filed a claim with NPS seeking an advance payment of half of the contract relocation price, $317,500.00.  Def.'s App. A276.  NPS denied Rollock's claim for an advance payment, citing a need for documentation that MRES had begun the relocation process, and it also informed Rollock of its awareness of the topsoil sale to Kinsley.  Def.'s App. A289 (Letter from Sindelar to Moot (July 5, 2011)).  NPS advised that it would reduce the self-move reimbursement to reflect the volume of topsoil sold to Kinsley.  *Id.* Shortly thereafter, Rollock responded by indicating that half of the stockpiled material had been moved and asking that payment be made.  Def.'s App. A292 (Letter from Moot to Sindelar (July 7, 2011)).  NPS took the position that because the topsoil was owned by Kinsley rather than by Rollock at the time of relocation, Rollock could not seek relocation costs for that material. Def.'s App. A295 (Letter from Sindelar to Moot (July 15, 2011)).  As with the denial of monitoring costs, NPS informed Rollock of its right to appeal the decision within 60 days to the Department of the Interior's Office of Hearings and Appeals.  *Id.*[17]

NPS revised the relocation amount to $451,541.48,[18] reflecting a reduction for the volume of topsoil removed by Kinsley.  Def.'s App. A306 (Letter from Sindelar to Moot (Aug. 5, 2011)).  Through a series of four payments, each for a quarter of the reduced amount, NPS approved and Rollock received $451,541.48, the complete amount of NPS's reduced total. Def.'s Mot. at 7; Pl.'s Opp'n at 18.  Rollock consistently stated that it believed it was entitled to the full amount of $635,000.00, Def.'s App. A297, and that it "d[id] not agree with the reduction

---

[15]References to the date of the hearing will be omitted in further citations to the hearing transcript.

[16]The purchase and sale agreement for the topsoil was embodied in a one-page letter that stated that Kingsley "shall take possession of the [t]opsoil and remove the [t]opsoil from [the Rollock site] as soon as possible."  Def.'s App. A294.

[17]Again, NPS did not provide any citations to statutes or regulations to explain the appeals process.  Pl.'s Opp'n at 16; *see also* Def.'s App. A295.

[18]Originally, NPS reduced the total to $484,879.57 but subsequently revised this amount to reflect a more accurate calculation of the material moved by MRES.  *See* Def.'s App. A295, A306.

in the price," Def.'s App. A320, A343, A349.  Rollock uniformly certified its claims on the form provided by NPS to make a "Claim for Relocation Payments – Nonresidential."  *See*, *e.g.*, Def.'s App. A322, A340, A349.  With each payment, NPS notified Rollock of its right to appeal the decision within 60 days to the Department of Interior's Office of Hearings and Appeals.  *See* Def.'s App. A306-07, A337, A361-62.  No such appeals were filed.

## STANDARDS FOR DECISION

To bring claims before the court, the plaintiff must plausibly allege sufficient facts to show the court's subject matter jurisdiction over each claim.  *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 706 (2013) (citing *McNutt v. General Motors Acceptance Corp of Ind.*, 298 U.S. 178, 189 (1936)).  When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), unchallenged factual allegations in the complaint will be construed in favor of the pleader, but any disputed jurisdictional facts must be shown by a preponderance of the evidence.  *Id.*  The court may look beyond the pleadings and inquire into jurisdictional facts.  *See Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991).

As an alternative to dismissal under RCFC 12(b)(1), the government has moved for summary judgment under RCFC 56.  RCFC 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it is one "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute is one that "may reasonably be resolved in favor of either party."  *Id.* at 250.

## ANALYSIS

### A.  The Statutes Underpinning Rollock's Contractual Claims

The Tucker Act, 28 U.S.C. § 1491(a), grants this court jurisdiction over disputes arising under contracts with the federal government.  In pertinent part, the Tucker Act provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  To support jurisdiction over its claims, Rollock additionally invokes the Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b), which allows a contractor to challenge a decision by a federal contracting officer denying a claim under certain contracts by bringing an "action directly on the claim in the United States Court of Federal Claims."  41 U.S.C. § 7104(b)(1).  The Tucker Act expressly recognizes this grant of jurisdiction and states, "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41."  28 U.S.C. § 1491(a)(2).

The CDA applies to "any express or implied contract . . . made by an executive agency for – (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property;

or (4) the disposal of personal property." 41 U.S.C. § 7102. Rollock concedes that it had a contract with NPS for the purchase of real property, which is excluded from the CDA's scope. Pl.'s Opp'n at 22-23. It contends, however, that this case turns on the contemporaneously executed Relocation Agreement, which addressed the procurement of personal property, the provision of monitoring services, and the alteration of real property by removal of personal property, and calls for application of the CDA to all of the claims at issue. *Id.* at 24.

The government disagrees that the CDA applies and contends that the Relocation Act is the appropriate basis for Rollock's claims for money damages. Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply") at 4-8, ECF No. 19. Congress created the Relocation Act to establish a "[u]niform policy on real property acquisition practices." 42 U.S.C. § 4651 (heading). As a general matter, the Relocation Act provides federal agencies with a process for negotiating the purchase of private property for public use. *See* 42 U.S.C. § 4651. In connection with federal purchases or condemnation of real property, the Act sought to provide "relocation assistance policies . . . for fair, uniform, and equitable treatment of all affected persons." 42 U.S.C. § 4621(a)(2). The relocation assistance authorized to be provided encompasses, among other things, "actual reasonable expenses in moving [the displaced person], his family, business, farm operation, or other personal property." 42 U.S.C. § 4622(a)(1). In recognition that disagreements might arise, the Relocation Act provides a general outline of procedures to be used in resolving disputes over relocation assistance. Section 213 of the Act, as amended by Pub. L. 100-17, § 412, 101 Stat. 132, 254-55 (1987), provides in pertinent part that:

> *The head of the lead agency is authorized to issue such regulations and establish such procedures as he may determine to be necessary to assure –*
>
> . . .
>
> (2) that a displaced person who makes proper application for a payment authorized for such person by this subchapter shall be paid promptly after a move or, in hardship cases, be paid in advance;
>
> (3) *that any aggrieved person may have his application reviewed by the head of the Federal agency having authority over the applicable program or project.*

42 U.S.C. § 4633(b) (emphasis added). The "lead agency" is defined as the Department of Transportation. 42 U.S.C. § 4601(12).

The Department of Transportation, acting under the authority of Section 213, has promulgated implementing regulations found in 49 C.F.R. Part 24.[19] Among other things, these

---

[19]The Department Transportation established these regulations in 1987 as "a single government[-]wide rule codified in one instead of 17 places in the Code of Federal Regulations." Uniform Relocation Assistance and Real Property Acquisition Regulation for Federal and Federally Assisted Programs, 52 Fed. Reg. 47,994, 48,105 (Dec. 17, 1987) (codified at 49 C.F.R. Part 24). The Department of Transportation's regulation was to replace agency specific codifications of a government-wide verbatim common rule. The Department of the Interior was

regulations establish general requirements for relocation payments, 49 C.F.R. § 24.207, including payments for moving and related expenses, 49 C.F.R. §§ 24.301-.306. A person who contends that the acquiring agency "has failed to properly consider the person's application for assistance . . . includ[ing] . . . a relocation payment under this part" may file a written "appeal" with the acquiring agency. 49 C.F.R. § 24.10(b). After the agency reaches a decision on the appeal, and "[i]f the full relief requested is not granted, the [a]gency shall advise the person of his or her right to seek judicial review of the [a]gency decision." 49 C.F.R. § 24.10(g). This regulation also addresses the timing of an appeal and the right of a person to representation and to inspect relevant materials. 49 C.F.R. § 24.10(c), (d), (e).

## B.  Applicability of the CDA

In support of its argument that the CDA serves as the basis for all of its claims, Rollock cites to *Bonneville Assocs. v. United States*, 30 Fed. Cl. 85 (1993), as support for the contention that the CDA may apply to a dual-purpose contract where one purpose is covered under the CDA but another purpose is not. *See* Pl.'s Opp'n at 22. This reading of *Bonneville Associates* is correct, but Rollock only gets partial help from this decision. While the court in *Bonneville Associates* did ultimately apply the CDA's provisions, it did so only to part of the contract. The court determined that dual elements of the contract were sufficiently distinct that it could apply the CDA to one aspect of the contract without concerning the other. *See Bonneville Assocs.*, 30 Fed. Cl. at 88. Thus, *Bonneville Associates* informs that claims under a dual-purpose contract may be severable and that different statutes may apply to claims arising from such a contract. Here, Rollock brings separate claims, one for monitoring costs and another for relocation costs for embedded materials, *see* Compl. ¶¶ 21, 28-29, and these claims can and do have different statutory predicates.

Based on the terms of the Agreement, the monitor was responsible to oversee (1) the sale of business scrap inventory from Rollock to NPS and (2) the removal of the embedded material from the Rollock site. Def.'s App. A59. The removal of the embedded material did not begin until after the sale to the government of the business scrap inventory. *Id.* Therefore, costs associated with the monitor pertain both to the government's purchase of Rollock's scrap inventory and to the removal of Rollock's personal property, specifically the embedded material.[20] The purchase by NPS of the business scrap inventory is manifestly a procurement

---

one of the agencies directed to remove its own regulation even though that regulation only referred to the Department of Transportation's regulations. *Id.* at 48,024. In the 1988 and 1989 editions of the Code of Federal Regulations, Interior's regulations included a cross-reference to the regulations found in 49 C.F.R. Part 24. *See* 41 C.F.R. § 114-50.301-1 (1988); 41 C.F.R. § 114-50.301-1 (1989). This cross-reference has since disappeared from Interior's regulations.

In all events, the government emphasizes that the Department of Transportation's regulations reach "[g]overnment-wide," applying to all federal departments and agencies, including the Department of the Interior. Def.'s Mot. at 15.

[20]As noted earlier, the CDA governs a contract for procurement of personal property by an executive agency. 41 U.S.C. § 7102. "'Procurement' [in the CDA] is 'the acquisition by purchase, lease or barter, of property or services for the *direct benefit or use* of the [f]ederal

under the CDA. As a result, the portion of the monitoring costs associated with overseeing the sale of the business scrap inventory is properly governed by the CDA.

The removal and relocation of the embedded material is a different matter. Rollock argues that the relocation of embedded material is an "alteration of real property" within the meaning of the CDA. Pl.'s Opp'n at 22-23 (referring to a portion of the applicability delineation in 41 U.S.C. § 7102(3) of contracts to which the CDA applies). The purpose of removing the embedded material, however, was to enable Rollock to relocate its personal property. Any alterations in the Rollock site were secondary to achieving this purpose. This is evidenced by NPS's original offer omitting any reference to embedded materials and Rollock's insistence that embedded materials should be included in the Agreement. *See* Def.'s App. A15-16; *see also* Pl.'s Opp'n at 12-13. In short, recovery and removal of the embedded material is attendant to a move of personal property as a result of the government's acquisition of land and therefore falls under the Relocation Act. Indeed, the Agreement specified that the self-move of the embedded materials was governed by regulations under the Relocation Act, 49 C.F.R. § 24.301(d)(2)(i). *See* Def.'s App. A59. Consequently, the monitoring costs associated with the removal and relocation of the embedded material are also governed by the Relocation Act rather than the CDA.

Nonetheless, Rollock avers that "there is no conflict between the CDA and the [Relocation] Act and, in fact, that the CDA is the only appropriate way to bring a breach of contract claim against the United States." Pl.'s Opp'n at 26 (citing *Zoeller v. United States*, 65 Fed. Cl. 449, 459-60 (2005)). In *Zoeller*, the plaintiff had leased parcels of land from the government at Fort Leavenworth, Kansas, and brought suit alleging claims under the CDA and the Relocation Act for the government's partial termination of a lease on several of the parcels. 65 Fed. Cl. at 452. The plaintiff alleged, in part, that he "suffered a compensable taking when the government did not follow certain guidelines outlined in section 4651 of [title 42, part of the Relocation Act]," which sets out "[u]niform policy on real property acquisition practices," 42 U.S.C. § 4651 (heading). *Zoeller*, 65 Fed. Cl. at 452. The court determined that plaintiff could not recover because (1) he was not a landowner and therefore not covered by the Relocation Act, (2) the Relocation Act does not mandate money damages for failure to comply with the provisions provided in Section 4651, and (3) judicial review of an agency's actions under Section 4651 is foreclosed by 42 U.S.C. § 4602, which explicitly provides that Section 4651 "create[s] no rights or liabilities and shall not affect the validity of any property acquisitions by purchases or condemnation. *See Zoeller*, 65 Fed. Cl. at 459-60. Rollock argues that although the court dismissed the *Zoeller* claims, its analysis under both the CDA and the Relocation Act indicates that there is no conflict between the two statutes and a plaintiff may choose to file claims under either one or the other. Pl.'s Opp'n at 28. As the government points out, however, this argument fails to consider that the lease of real property in *Zoeller* was governed by the CDA. *See* Def.'s Reply at 5 (citing *Forman v. United States*, 767 F.2d 875, 878-79 (Fed. Cir. 1985) (holding that leases from the government are contracts subject to the CDA)). The

---

[g]overnment.'" *Wesleyan Co., Inc. v. Harvey*, 454 F.3d 1375, 1378 (Fed. Cir. 2006) (emphasis in the original) (quoting *New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989)).

Relocation Act is applicable to acquisition by the government of a landowner's real property, *see Zoeller*, 65 Fed. Cl. at 459, but the CDA is not.

Additionally, the court's observations in *Zoeller* regarding the justiciability of Section 4651 of the Relocation Act are irrelevant to the case at hand because Rollock is not relying on Section 4651 as a basis for money damages. Any such reliance would have been unavailing. The provisions of 42 U.S.C. § 4602 explicitly bar reliance on the policies set out in Section 4651 as a basis for monetary claims. *See also Delancey v. City of Austin*, 570 F.3d 590, 593-95 (5th Cir. 2009) (holding that policy provisions of the Relocation Act do not create any private rights of action for money damages, applying the factors enunciated in *Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002)). In *Zoeller*, the plaintiff relied on general guidelines provided in the Relocation Act. *Zoeller*, 65 Fed. Cl. at 452. Because these guidelines were not enforceable by money damages and were not subject to judicial review, the plaintiff could not recover. *Id.* at 459-60. Contrastingly, the provision of the Relocation Act upon which Rollock relies specifically provides for payment by an agency of moving costs wholly apart from the CDA, *see* 42 U.S.C. § 4622(a)(1), and disputes over such payments can be considered by courts, *see Pou Pacheco v. Soler Aquino*, 833 F.2d 392 (1st Cir. 1987); *Tullock v. State Highway Comm'n*, 507 F.2d 712, 715 (8th Cir. 1974).

## C.  Prerequisites for a Claim under the CDA

For the court to exercise jurisdiction over a claim made under the CDA, the contractor must first submit a written claim to the contracting officer and the contracting officer must issue a final decision on the claim. *Northrup Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1110-12 (Fed. Cir. 2013); *Rex Sys., Inc. v. Cohen*, 224 F.3d 1367, 1372 (Fed. Cir. 2000). A claim under the CDA must be "(1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain." *James M. Ellett Constr. Co. v. United* States, 93 F.3d 1537, 1542 (Fed. Cir. 1996). The claims need not take any specific form as long as they provide the contracting officer with adequate notice of the basis and the amount of the claims. *Northrup Grumman*, 709 F.3d at 1112-13; *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592-93 (Fed. Cir. 1987). For a claim over $100,000, the contractor must certify the claim in accordance with 41 U.S.C. § 7103(b)(1).

The government argues that Rollock failed to satisfy these requirements because the submission of claims to Ms. Beyer, Mr. Sindelar, and Mr. Conte do not satisfy the requirement of a submission to a contracting officer. Def.'s Reply at 6-7. There are a number of problems with the government's contention. First, the government has failed to name the appropriate person with whom Rollock should have filed a claim. Second, it is evident that submission of claims to these individuals was sufficient to receive at least a portion of payment on the claims. *See* Def.'s App. A94 (approval dated Dec. 10, 2009), A152 (approval dated July 13, 2010), A221 (approval dated Oct. 4, 2010), A235 (approval dated Dec. 20, 2010). Third, these individuals responded to Rollock's submission of claims with either payment or an explanation refusing payment – including a letter from Ms. Beyer constituting "a final response." Def.'s App. A248; *see also* Def.'s App. A94 (Beyer's recommendation for payment), A159 (Beyer's request for additional documentation to enable processing of a claim), A165 (Beyer's statement of NPS's position on monitoring costs), A211 (Conte's reiteration of NPS's position on monitoring,

containing citations to portions of the Agreement).[21]  If, as the government contends, they were unauthorized to respond, this was not evident in any of the correspondence.  Moreover, as stated in *United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627 (2004), "[t]his [c]ourt has rejected attempts by the government to attack a contractor's submission of a claim based on its delivery to the wrong government employee." *Id*. at 638 (citing *Flying Horse v. United States*, 49 Fed. Cl. 419, 428-29 (2001) (plaintiff did not know who the proper contracting officer was and government failed to make proper inquiry and forward the claim)).  Correlatively, the Federal Circuit has held that in the obverse situation, *i.e.*, transmission from the government to the contractor, the submission need only be delivered to an authorized agent of the contractor to fulfill the requirements of the CDA.  *See Borough of Alpine v. United States*, 923 F.2d 170, 172 (Fed. Cir. 1991).

The government also argues that the claims were not properly certified as required by Section 7103(b) of the CDA.  Def.'s Reply at 7.[22]  In asserting this position, however, the

---

[21]In the proceedings before NPS, the parties referred to monitoring costs generally, without distinguishing between those related to disposition of the scrap inventory and those related to excavation of the embedded material.  As discussed *supra*, at 10-11, only Rollock's claims regarding monitoring of the scrap inventory are subject to the CDA.

[22]In relevant part, the statute provides that:

> For claims of more than $100,000 made by a contractor, the contractor
>  shall certify that —
> (A)  the claim is made in good faith;
> (B)  the supporting data are accurate and complete to the best of the contractor's knowledge and belief;
> (C)  the amount requested accurately reflects the contract adjustment for which the contactor believes the Federal Government is liable; and
> (D)  the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b)(1).

The certification on the form provided by NPS for use with the Relocation Act, which was actually used by Rollock, states that:

> I (we) CERTIFY under the penalties and provisions of U.S.C. Title 18, Sections 286, 287, 1001, and any other applicable law, that this claim and information submitted herewith have been examined by me (us) and are true, correct, and complete. I (we) further certify that I (we) have not submitted any other claim for, or received reimbursement or compensation from any other source for any item of this claim, and that any receipts submitted herewith accurately reflect costs actually incurred. I (we) further certify that my (our) choice of payment was made on the basis of a full

government fails to account for the fact that Rollock did not file a single claim for monitoring costs but rather submitted a series of claims, none amounting to over $100,000.  *See* Def.'s App. A87 (claim for $15,840), A104 (claim for $26,565), A110 (claim for $18,180), A119 (claim for $16,060), A127 (claim for $12,060), A231 (claim for $76,305).  Therefore, no certification was necessary.  Regardless, the court is satisfied that Rollock's certification on NPS's form for a "Claim for Relocation Payment" satisfies the certification requirements of Paragraph 7103(b)(1) of the CDA.  Rollock's claim for monitoring costs, as it relates to costs associated with the sale of business scrap, is within the court's jurisdiction under the CDA.[23]

## D.  Suit Under the Relocation Act

The government argues that the court cannot exercise subject matter jurisdiction over any claims under the Relocation Act because Rollock has failed to exhaust its administrative remedies.  Def.'s Mot. at 13.  The doctrine of exhaustion of administrative remedies provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."  *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50-51 (1938).  Although the government frames its exhaustion argument as a threshold jurisdictional question, the doctrine of exhaustion includes both statutory exhaustion, which is jurisdictional, and prudential exhaustion, which is not.  *See McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded by statute on other grounds*, Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321-71 (1996) (codified as amended at 42 U.S.C. § 1997e, *et seq.*), *as recognized in Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006); *see also White & Case LLP v. United States*, 67 Fed. Cl. 164, 169 (2005).

Statutory exhaustion is required "[w]here Congress specifically mandates" it, *McCarthy*, 503 U.S. at 144, with "sweeping and direct statutory language indicating that there is no federal jurisdiction prior to exhaustion, or the exhaustion requirement is treated as an element of the underlying claim."  *Elk v. United States*, 70 Fed. Cl. 405, 407 (2006) (internal quotation marks omitted) (quoting *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004)).  Contrastingly, prudential exhaustion places the decision of whether to require exhaustion prior to judicial review within the sound discretion of the court.  *McCarthy*, 503 U.S. at 144.  In exercising judicial discretion, the court considers "the 'twin purposes of protecting administrative agency authority and promoting judicial efficiency.'"  *White & Case*, 67 Fed. Cl. at 170 (quoting *McCarthy*, 503 U.S. at 145).  The court considers these two exhaustion principles in turn.

---

explanation by the displacing agency representative of the differences between the types of payments available.

Def.'s App. A94, A152, A221, A235.

[23]Even assuming that the certifications were inadequate, any defect in the certifications "does not deprive a court . . . of jurisdiction over the claim."  41 U.S.C. § 7103(b)(3).  Rather, the court simply must "require a defective certification to be corrected."  *Id.*

1.   *Statutory exhaustion.*

In the government's view, the Relocation Act and its regulations provide sufficient evidence to indicate that statutory exhaustion applies.  *See* Def.'s Mot. at 13-18.  In support of its argument, the government cites to legislative history indicating that Congress sought in the Relocation Act to provide an administrative process as "'an alternat[ive] to judicial review.'"  Def.'s Mot. at 14-15 (quoting H.R. Rep. No. 91-1656 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5850, 5855).  Correlatively, the Department of Transportation's regulations establishing a process for submission of claims coupled with administrative appeals procedures express an objective to "minimize litigation and relieve congestion in the courts."  49 C.F.R. § 24.1(a); *see also* 42 U.S.C. § 4651.

The Relocation Act is silent insofar as judicial action is concerned.  No jurisdictional grant or waiver of sovereign immunity is provided.  Claimants are thus forced to turn to other statutes as a basis for juridical redress.  District courts can take jurisdiction over Relocation Act claims pursuant to the federal question statute, 28 U.S.C. § 1331, but that statute does not supply a waiver of sovereign immunity for suits against the federal government, *see, e.g.*, *Reed v. Reno*, 146 F.3d 392, 397-98 (6th Cir. 1998) (citing *Sibley v. Ball*, 924 F.2d 25, 28 (1st Cir. 1991), *aff'd upon transfer*, 944 F.2d 913 (Fed. Cir. 1991)).  The Administrative Procedure Act ("APA"), 5 U.S.C. § 702, however, specifically waives sovereign immunity where it applies, *see Black Hills Inst. of Geological Research v. South Dakota School of Mines & Tech.*, 12 F.3d 737, 740 (8th Cir. 1993) ("Section 702 waives the federal government's sovereign immunity in cases challenging agency action . . . and seeking relief other than money damages."), and that waiver can be coupled with jurisdiction under the federal question statute, *see Califano v. Sanders*, 430 U.S. 99, 105-07 (1977) (addressing the effect of the amendment of Section 1331 in 1976, to remove an amount-in-controversy requirement); *cf. A.E. Finley & Associates, Inc. v. United States,* 898 F.2d 1165 (6th Cir. 1990) (holding that APA waives sovereign immunity in a suit brought under the federal question jurisdictional statute).  The waiver pertains to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The "adequate remedy" limitation on APA review ordinarily bars a suit against the federal government for money damages in a district court where such damages are available in a suit in this court.  *See, e.g.*, *Brazos Elec. Power Co-op v. United States*, 144 F.3d 784, 786-88 (Fed. Cir. 1998) (affirming an order by a district court transferring a case to the Court of Federal Claims where damages were sought for breach of contract); *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1228-30 (5th Cir. 1976) (holding that a suit seeking damages for breach of contract belonged in the Court of Claims and not the district court under the APA); *cf. Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 607-08 (D.C. Cir. 1992) (ruling that district court had jurisdiction over a suit for equitable relief under the waiver of sovereign immunity in the APA, because the Claims Court could not grant the requested equitable relief).[24]

---

[24]In *Boyd v. Browner*, 107 F.3d 922 (D.C. Cir. 1996) (Table, decision available at 1996 WL 678614), the D.C. Circuit instructively considered the jurisdiction available to a district court under the federal question statute and the APA, as contrasted to that provided to a district court and the Court of Federal Claims under the Little Tucker Act and Tucker Act, respectively. *See id.*, 1996 WL 678614, at *2-*4.

The Little Tucker Act, 28 U.S.C. § 1346(a)(2), provides district courts with a waiver of sovereign immunity for claims against the federal government but only for claims seeking money damages up to $10,000.  Suits in district court respecting claims under the Relocation Act are consequently not often filed under the Little Tucker Act.  And, where district courts have taken jurisdiction over Relocation Act claims pursuant to Section 1331 and reliant upon the APA's waiver of sovereign immunity, they have found an exhaustion requirement because the APA independently requires exhaustion of all available administrative remedies, *i.e.*, the agency action must be "final" before a suit may be brought, regardless of whether the underlying statute requires exhaustion.  *See, e.g.*, *Dalton v. Las Vegas*, 282 Fed. Appx. 652, 656 (10th Cir. 2008); *Consumers Power Co. v. Costle*, 468 F. Supp. 375, 380 (E.D. Mich. 1979), *aff'd*, 615 F.2d 1147 (6th Cir. 1980); *249.12 Acres of Land v. United States*, 414 F.Supp. 933, 935 (W.D. Okla. 1976); *Smith v. Cookeville*, 381 F. Supp. 100, 102, 106 (M.D. Tenn. 1974).

In this court, jurisdiction regarding Relocation Act claims depends upon the grant provided by the Tucker Act.  In this context, the government relies on *Mayne v. United States*, 13 Cl. Ct. 60 (1987), to support its argument that a claim for damages under the Relocation Act requires statutory exhaustion.  Def.'s Mot. at 16.  That reliance is inappropriate.  The court in *Mayne* required exhaustion on prudential, not statutory, grounds.  *Mayne*, 13 Cl. Ct. at 65.  In addition, *Mayne* is distinguishable from the case at hand in two ways.  First, in *Mayne*, the plaintiffs never filed any claim with the government agency prior to bringing the case before the court.  *Id*.  The court's determination that plaintiffs failed to exhaust their administrative remedies reflected this failure to initiate the agency process or even to inform the agency of the dispute.  *Id.*  Rollock, on the other hand, submitted administrative claims to NPS prior to filing suit.  Second, the plaintiffs in *Mayne* had no contract with the agency respecting relocation assistance.  Contrastingly, Rollock has a specific relocation agreement over which it is suing.

Unlike the APA, the Tucker Act does not require exhaustion of *permissive* administrative remedies before bringing a suit in this court, but it does require exhaustion of *mandatory* administrative remedies.  *See Martinez v. United States*, 333 F.3d 1295, 1304 (Fed. Cir. 2003).  Whether an administrative remedy is permissive or mandatory rests on whether Congress specifically intended for the agency to retain a right to complete initial decision-making authority.  *Id*. at 1305.  The court's military pay cases illustrate this distinction.  Claims for unlawful discharge brought under the Military Pay Act, 37 U.S.C. § 204, can be submitted either to a military corrections board or to a court because the cause of action has been held to accrue at the time of discharge, separation, or other definitive action, and the service member may sue immediately.  *See Chambers v. United States*, 417 F.3d 1218, 1224 (Fed. Cir. 2005); *Martinez*, 333 F.3d at 1303.  Thus, the option to go before the military corrections board is considered "a permissive administrative remedy and . . .  not a mandatory prerequisite to filing a Tucker Act suit challenging the discharge."  *Martinez*, 333 F. 3d at 1304 (citing *Richey v. United States*, 322 F.3d 1317, 1325 (Fed. Cir. 2003).  In determining that wrongful military discharge claims accrue immediately upon discharge, separation, or other definitive action, the Federal Circuit looked to Congress's intent when creating the military correction boards.  Prior to creation of the correction boards, service members could bring claims before the Court of Claims or seek a private bill of redress from Congress.  *See id.* at 1306-07.  A service member was not first required to seek redress from Congress before bringing a claim in the Court of Claims.  *See id.*  When Congress created the military corrections boards to relieve its burden to address individual

requests for private bills, it did not evidence that it was attempting to create a new rule of exhaustion. *See id.* at 1307-08; *see also Ogden v. Zuckert*, 298 F.2d 312, 314-15 (D.C. Cir. 1971) ("The Board furnishes a means by which to seek correction of error or injustice, but neither statute nor regulation requires this means to be pursued as a condition to finality of the Secretary's action.").

On the other hand, claims of entitlement to disability retirement pay, arising under 10 U.S.C. § 1201, are subject to an administrative exhaustion requirement because such claims "do not accrue until the appropriate military board either finally denies such a claim or refuses to hear it." *Chambers*, 417 F.3d at 1224. As a result, exhaustion of the available administrative procedure is mandatory prior to bring a Tucker Act claim to court. *Id.* at 1225 (citing *Friedman v. United States*, 310 F.2d 381, 392 (Ct. Cl. 1962)). Unlike military discharge cases, in disability retirement cases, "Congress has entrusted the military boards with the task of determining whether a serviceman should be retired for disability and therefore . . . no cause of action arises . . . until a proper board has acted or declined to act." *Friedman*, 310 F.2d at 389. Courts have consistently held that a determination by the secretary of the pertinent military branch that a service member is or is not entitled to disability retirement pay is a pre-requisite to judicial action. *See, e.g.*, *Levadi v. United States*, 146 F. Supp. 455, 456 (Ct. Cl. 1956). In *Levadi*, the court explained that without a determination by the Secretary, no right to disability retirement pay has been granted or denied. No such Congressional constraint exists in claims of unlawful discharge or separation. *See Martinez*, 333 F.3d at 1304.

The Relocation Act and its regulations provide no indication that Congress sought to require agency appeals prior to judicial review. The Relocation Act's authorization to promulgate appeal procedures is written in permissive terms. The statute states that the "head of the lead agency is authorized to issue such regulations and establish such procedures as he *may* determine to be necessary." 42 U.S.C. § 4633(b) (emphasis added). Congress did not even mandate the existence of an agency appeals process under the Relocation Act. The inquiry does not end there. Because Congress delegated the task of establishing procedures for administrative claims to the lead agency, the Department of Transportation, *see* U.S.C. § 4633(b), quoted *supra*, at 9, the court must consider the regulations promulgated by that department. *Cf. Sandvik Steel Co. v. United States*, 164 F.3d 596, 599-600 (Fed. Cir. 1998) (considering the agency's regulations when "Congress did not prescribe the scope of determination proceedings"); *Elk*, 70 Fed. Cl. at 407-08 (looking at regulations to determine executive branch intent when resolving the existence of statutory exhaustion). Here, the relevant regulation, found at 49 C.F.R. § 24.10, does not provide a comprehensive scheme for appeals. In fact, Rollock was not informed that this regulation formed the basis of the appeals process. In addition, Subsection 24.10(b) states that "[a]ny aggrieved person *may* file a written appeal." 49 C.F.R. § 24.10(b) (emphasis added); *see Massie v. United States Dep't of Housing & Urban Dev.*, 620 F.3d 340, 359 (3d Cir. 2010) (holding that regulations of the Department of Housing and Urban Development under the Relocation Act, consisting of the same language as Part 24, do not require exhaustion of administrative remedies). As the Third Circuit instructively observed in *Massie*,

> [t]he relevant regulation related to the Relocation Act merely
> allows for an administrative appeal, which a party "may file," but
> does not require this, 24 C.F.R. § 290.17(f). In *Darby v. Cisneros*,

> 509 U.S. 137, 154 (1993) [parallel citations omitted], the Supreme
> Court held that "where the APA applies, an appeal to 'superior
> agency authority' is a prerequisite to judicial review *only* when
> expressly required by statute or when an agency rule requires
> appeal before review and the administrative action is made
> inoperative pending that review." Here such review is not
> expressly required, but merely permitted, and hence exhaustion of
> the administrative appeal process was not necessary.

620 F.3d at 359 (emphasis in the original). In short, the regulations addressing administrative appeals cannot be characterized as "sweeping and direct" in requiring exhaustion. *See Elk*, 70 Fed. Cl. at 407. Without an expression of explicit intent from Congress and given the permissive nature of the pertinent regulations promulgated by the Department of Transportation as the lead agency pursuant to Congress's delegation, the court cannot find that statutory exhaustion of administrative remedies is necessary before filing a Relocation Act claim in this court.[25]

    *2. Prudential exhaustion.*

    Having found that the Relocation Act itself does not require exhaustion of administrative appeals before filing a claim in this court, the pertinent question becomes whether, for prudential reasons, the court should require exhaustion of administrative appeals.

    In considering prudential exhaustion, the court is called to balance the interests of the individual, which favor prompt access to a judicial forum, *see McCarthy*, 503 U.S. at 146 ("[F]ederal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them." (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-18 (1976))), against countervailing institutional interests, *see Elk*, 70 Fed. Cl. at 408 (citing *McCarthy*, 503 U.S. at 146). The Federal Circuit has "long held that, in Tucker Act suits, a plaintiff is not required to exhaust a permissive administrative remedy before bringing suit." *Martinez*, 333 F.3d at 1304. A court should also consider "at least three broad sets of circumstances" that weigh against imposing prudential exhaustion. *McCarthy*, 503 U.S. at 146. First, the court should not require exhaustion if the administrative remedy may create undue prejudice to subsequent court action, specifically in cases where there is an unreasonable or indefinite timeframe at the agency level. *Id.* at 146-47. Conversely, the administrative remedy may be helpful to provide the agency with an opportunity to develop an administrative record, correct errors, and narrow the issues needing judicial resolution. *See Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013). Second, requiring exhaustion is not advisable when there is "doubt as to whether the agency [is] empowered to grant effective relief." *McCarthy*, 503 U.S. at 147 (internal quotation marks and citation omitted). Third,

---

    [25]The Department of Transportation's regulation does not purport to condition judicial action on completion of the administrative process. Indeed, the only mention of a judicial role in the regulation is in Subsection 24.10(g), which states that a person who received less than full relief requested from the agency process "shall [be] advised . . . of his or her right to seek judicial review of the [a]gency decision." 49 C.F.R. § 24.10(g).

exhaustion should not be required when the administrative body "is shown to be biased or has otherwise predetermined the issue before it." *Id.* at 148 (internal citation omitted).

Although the regulations in Part 24 provide some assurances regarding agency review, *e.g.*, Subsection 24.10(g) requires prompt review by the agency and Subsection 24.10(h) requires a disinterested reviewer, 49 C.F.R. §§ 24.10(g), (h), the Department of the Interior's implementation of these regulations is uncertain and indefinite in its contours. First, Rollock was not informed of any statutory or regulatory authority regarding the appeals process. As a result, it was not told of the extent of its rights or the details of the review process. Second, the information NPS did provide to Rollock is at odds with the timeline requirements in the Department of Transportation's overarching and binding regulations. Subsection 24.10(c) states that an agency "may set a reasonable time limit" for filing an appeal but that "[t]he time limit shall not be less than 60 days after the person received written notification of the [a]gency's determination on the person's claim." 49 C.F.R. § 24.10(c). In short, Interior may set a reasonable time limit within which a person may file an appeal, but that time limit has to be at least 60 days or more. NPS's notifications, however, all stated that an appeal must be filed *within* 60 days. *See* Def.'s App. A245, A295, A322, A340, A346.[26] Finally, Interior's regulations do not provide information regarding how hearings will be conducted, what material should be submitted, or how evidence will be weighed. The Department of the Interior's process for handling hearings and appeals is geared to issues regarding Indian affairs, public lands, federal oil and gas royalties, and surface coal mining regulations, *see* 43 C.F.R. Part 4, Subparts D, E, J, and L, although Interior did include a general catch-all subpart that covers unspecified hearings and appeals, *see* 43 C.F.R. Part 4, Subpart G, and that catch-all would apply in this instance.

In this instance, because NPS addressed some of Rollock's claims but not others, it is not apparent how Interior's rules regarding appeals would be applied, especially to the claims NPS did not decide, even tentatively. Ordinarily, the agency would have an institutional concern that it have an opportunity to develop the factual record of a disputed matter. If this case were to be dismissed on grounds of prudential exhaustion, the court's concerns regarding the process would remain unresolved. *See Elk*, 70 Fed. Cl. at 409 n.3. Given the court's general determination that the exhaustion of a permissive administrative process is not necessary in Tucker Act suits, along with the concerns regarding Interior's process for reviewing NPS decisions, the court declines to require prudential exhaustion of the administrative appeal remedy.

### 3. Jurisdictional questions apart from exhaustion.

In addition to the considerations of exhaustion, the court has an obligation to determine if additional hindrances to jurisdiction exist. Generally this court has exclusive jurisdiction over claims arising under contracts with the federal government in which the plaintiff seeks more than $10,000 in damages. *See* 28 U.S.C. § 1346(a)(2); *see also Greenhill v. Spellings*, 482 F.3d 569,

---

[26]More confusingly, regulations promulgated by the Department of the Interior that govern its generally applicable appeals process require a person to "file a written notice of appeal . . . within *30 days*" from the date of the decision. 43 C.F.R. § 4.701 (emphasis added).

573 (D.C. Cir. 2007).  This is such a case, and no impediments appear to arise with this court's exercise of jurisdiction to consider Rollock's claims under the Tucker Act.[27]

## E.  Remand

Once the court determines that a case is within its jurisdiction, it has juridical power to enter an order remanding the case to another body, either at the request of a party or on its own motion.  *See Emerald Coast Finest Produce Co. v. United States*, 75 Fed. Cl. 549, 553 (2007) (citing 28 U.S.C. § 1491(a)(2)).  The Tucker Act grants this court "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."  28 U.S.C. § 1491(a)(2).  When the factual record before the court is incomplete or additional agency proceedings or action are necessary, a remand may be

---

[27]The Relocation Act does not displace the jurisdiction that would arise under the Tucker Act.  The Supreme Court recently addressed the criteria for such displacement in *United States v. Bormes*, __ U.S. __, 133 S. Ct. 12 (2012), where the Court determined that the Little Tucker Act was displaced, and therefore this court and the Federal Circuit lacked jurisdiction, when a separate statute contained a detailed "self-executing remedial scheme."  *Bormes*, __ U.S. at __, __, 133 S. Ct. at 18.  Although the Court in *Bormes* was primarily analyzing the grant of sovereign immunity in the Little Tucker Act, 28 U.S.C. § 1346(a)(2), rather than the Tucker Act, 28 U.S.C. § 1491(a)(1), "[a]s relevant here, the scope of the two statutes is otherwise the same." *Bormes*, __ U.S. at __, 133 S. Ct. at 16 n.2.  When faced with a statute containing a detailed remedial scheme, the Court considered that a lower court should examine the statute's "own text" to determine the extent of damages liability and whether a waiver of sovereign immunity exists before proceeding on the merits.  *Id.* at 19.  If a statute provides a detailed and comprehensive enforcement regime standing apart from the Tucker Act, a plaintiff cannot "mix and match" the Tucker Act's grant of sovereign immunity with the damages or jurisdictional provisions of such a statute.  *Id.*  In this instance, unlike the statute in *Bormes*, which specified a statute of limitations and permissible venues for claims brought under the Federal Credit Reporting Act, neither the Relocation Act nor the Department of Transportation's regulations provide a detailed remedial scheme.  The regulations only refer generally to "judicial review." 49 C.F.R. § 24.10(g).  Thus, the *Bormes* displacement doctrine does not apply here, and it is appropriate to combine the Tucker Act's waiver of sovereign immunity with the Relocation Act's right to money damages.  *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472-73 (2003).

Separately, where money claims seeking specific relief rather than money damages are at issue, jurisdiction may also be excluded from this court's purview under the precedent established in  *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988).  Because this court lacks general equitable powers, the district courts are the appropriate forum for equitable monetary relief.  *Id.*  In *Bowen*, Massachusetts was awarded prospective injunctive relief for the government's refusal to reimburse the state for Medicaid expenses, which in essence provided monetary relief by way of an adjustment to future payments but did not provide a judgment for money.  *Id.* at 909.  Rollock's claims are properly considered claims for money damages because they seek a monetary judgment for alleged breach of contract.  *See Greenhill v. United States*, 81 Fed. Cl. 786, 790 (2008) ("[M]oney damages are the default remedy for breach of contract.")

appropriate.  *See Todd Constr., L.P. v. United States*, 88 Fed. Cl. 235, 245 (2009); *Emerald Coast*, 75 Fed. Cl. at 553.  Both deficiencies exist here.  NPS did not act on a number of Rollock's claims, and, when it did act, it left salient matters unresolved.  NPS should further develop the factual record and definitively act on Rollock's claims.

## CONCLUSION

For the reasons stated above, the government's motion to dismiss is DENIED, as is its alternative motion for summary judgment.  The portion of the claim for monitoring costs of the sale of metal scrap is governed by the CDA and Rollock has satisfied the claim requirements under that statute.  The portion of the claim for monitoring costs of the embedded materials and the claim for relocation costs of the embedded materials are governed by the Relocation Act.  The court has jurisdiction over these claims because the Relocation Act does not require exhaustion of administrative remedies.

Pursuant to RCFC 52.2, this case is remanded to the National Park Service for a period of six months.  *See* RCFC 52.2(b)(1)(B).  The case is stayed pending the results of the remand.  *See* RCFC 52.2(b)(1)(C).  The court requests that the parties file a status report on or before 90 days from the date of this decision, regarding the progress of the remand.  *See* RCFC 52.2(b)(1)(D).

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge